EDNA K. LIEBMANN, Appellant, *v.* MINIATURE INCANDESCENT LAMP CORPORATION, Respondent.

WILLIAM C. DURANT, Appellant, *v.* MINIATURE INCANDESCENT LAMP CORPORATION, Respondent.

LESTER HOFHEIMER, Appellant, *v.* MINIATURE INCANDESCENT LAMP CORPORATION, Respondent.

First Department, July 6, 1926.

Corporations — stock — action on agreement whereby corporation purchased its own stock — agreement provided for additional payments in case reserves set up in balance sheet for liabilities were too high — surplus of total reserves determines right of plaintiff to distributive share — neither pleadings nor agreement permit correction of amounts reserved for assets — certain items not properly chargeable against reserves for liabilities — claim by Federal government for taxes not assessed cannot be charged against reserves for liabilities.

The plaintiff and the defendant corporation entered into an agreement, under which the corporation purchased its own stock from the plaintiff and other stockholders at a stipulated price and agreed that in case the reserves set up in the balance sheet for liabilities proved to be too high, the unused portion would be distributed *pro rata* among the stockholders. This action is brought to recover plaintiff's *pro rata* share based on the fact that the reserves for liabilities were in excess of actual liabilities paid by the defendant corporation.

In determining whether or not the reserves for liabilities contained in the balance sheet were too high, the items of the reserves must be considered collectively, and stockholders are entitled to a further payment for the purchase of stock only if there is a surplus in the aggregate of all of the reserves after striking a balance between the surplus or deficit existing in the various separate items, and the stockholders are not entitled to the unused portion of each reserve taken by itself.

The defendant did not have the right to question the accuracy of the value of the assets listed in the balance sheet, since that question was not raised by the pleadings, and for the further reason that under the contract no right was reserved to question the accuracy of the amounts set down for assets.

The result of the agreement and the purchase of outstanding shares was a reorganization of the corporation and only such liabilities can be charged against the agreement as were incurred prior to the reorganization.

The defendant did not have the right to charge against the reserve for liabilities the amount paid as officers' salaries, since there was no evidence that the amount so paid was the fair and reasonable value of the service rendered in the interests of the old stockholders in liquidating the affairs of the corporation.

Liability for entertaining customers was not properly charged against the reserve, since that item evidently refers to expenses incurred by the new regime.

The item charged against reserve for liabilities based on a claim by the Federal government of a deficiency in tax was improper, since it is not shown that the tax was ever paid or even assessed by the Federal government. The mere assertion of the claim against the defendant for additional taxes, accompanied by no assessment, did not create a fixed liability which can be charged against the reserve for liabilities.

APPEAL in each of the above-entitled actions by the plaintiff from a judgment of the Supreme Court in favor of the defendant in each action, entered in the office of the clerk of the county of New York on the 17th day of June, 1925, upon the verdict of a jury rendered by direction of the court pursuant to a stipulation that the case be tried before the court without a jury and that the verdict be directed with the same force and effect as though a jury were present, with notice of intention to bring up for review an order entered in said clerk's office on the 11th day of June, 1925, granting the motion of the defendant in each action to tax as a disbursement fees paid to the sheriff on the vacation of the attachment in each action.

*John Thomas Smith* of counsel [*Anthony J. Russo* with him on the brief], for the appellants.

*W. N. Seligsberg* of counsel [*Seligsberg & Lewis*, attorneys], for the respondent.

DOWLING, J. There are three actions involved in this appeal which are identical except as to the appellant in each case. In the first of these appeals, taken as typical of all, the appellant brings her action as the owner of 150 shares of the capital stock of the respondent corporation upon an agreement with it by which she was to receive her proportionate share of the unused portion of certain reserves set up in a certain balance sheet embodied in the terms of the sale whereby she transferred said shares to the corporation.

The facts upon which appellant relies as establishing her cause of action are not in dispute and are as follows: The respondent, a foreign corporation, had outstanding 2,250 shares of its capital stock on February 1, 1921. The respondent company was one of a group of companies controlled by the General Motors Corporation interests. On December 1, 1920, one Durant, who had been president of the General Motors Corporation, " went out." He had been the majority stockholder of the respondent. The associated companies were in difficulties because of patent litigation and the product of two of them was inferior and Mr. Durant thought it would be best to sell them out. He had lost a great deal of money during the year 1920 and the transaction had to be closed in a hurry. The three plaintiffs in these cases, Durant, Hofheimer and Liebmann, together with Harper, its president, and two others were the stockholders of the respondent. Durant instructed Wagoner, his assistant, to " get rid " of it.

Negotiations were, therefore, started and carried on by Wagoner, with the result that all of the assets of the respondent, except its cash and bills receivable, were sold to the General Electric Company.

The consideration paid by the General Electric Company was its own stock and bonds of the approximate value of $422,000. The assets and liabilities of the defendant corporation as of December 31, 1920, were thus stated by defendant's president in a letter to appellant's attorney, dated January 20, 1921:

"Assets:

| | | |
|---|---:|---:|
| " Cash........................ | $46,169 02 | |
| " Accounts receivable.............. | 146,778 37 | |
| " Trade acceptances.............. | 50 65 | |
| | | $192,998 04 |
| " Liabilities: | | |
| " Notes payable.................. | $10,000 00 | |
| " Accounts payable.............. | 35,680 36 | |
| " Accrued liabilities: | | |
| " Salaries and wages. | | |
| " Insurance......... | | |
| " Bond and mortgage ⎬ ......... | 14,565 08 | |
| " Royalties......... | | |
| " Commissions...... | | |
| " Reserves income tax............ | 92,544 46 | |
| " Bad debts.................... | 12,248 30 | |
| " Cost of liquidation of assets, fees, etc........................ | 10,000 00 | |
| " Returns from Tulites........... | 15,000 00 | |
| | | 190,038 20 |
| | | $2,958 84 |
| | | 422,000 00 |
| | | $424,958 84 |

" This shows that the total net cost of the Miniature Company is $424,958.84 divided up into 2,250 shares makes a net value of $188.78 per share."

And he added: " It is my suggestion, however, at the end of twelve months that if any of the reserves set up should be found to be too high that, at that time, a further disbursement might be made, although I do not think it necessary to suggest it."

In compliance with a suggestion contained in said letter, appellant's attorney drafted a letter to the stockholders of the respondent, being a proposition for it to purchase their shares at $188.77 a share, payable forty per cent in General Electric common stock and sixty per cent in the latter corporation's debentures.

The draft letter was approved by respondent's president, who on February 1, 1921, sent out to all its stockholders an offer on its behalf, authorized by its directors, to purchase its outstanding shares at the price of $188.77, payable as above set forth, the price of the General Electric stock being fixed at $120 per share and of the latter's five per cent debentures at 85.

Therein the balance sheet of the respondent corporation was given substantially as fixed in the letter above referred to, the difference being but $215.82. In detail it was as follows:

" BALANCE SHEET AS OF DECEMBER 31, 1920.

| " Assets: | | |
|---|---:|---:|
| " Cash. | $46,169 02 | |
| " Notes receivable | 50 65 | |
| " Accounts receivable | 146,784 37 | $193,004 04 |
| " Securities: | | |
| " G. E. common stock | 169,680 00 | |
| " Debenture bonds | 252,097 08 | 421,777 08 |
| | | $614,781 12 |
| " Liabilities: | | |
| " Notes payable | 10,000 00 | |
| " Accounts payable | 35,680 36 | |
| " Accrued liabilities | 14,565 08 | 60,245 44 |
| " Reserve for Federal taxes | 92,544 36 | |
| "    "    allowances | 15,000 00 | |
| "    "    bad debts | 12,248 30 | |
| "    "    liquidation expense. | 10,000 00 | 129,792 66 |
| " Net worth | | 424,743 02 |
| | | $614,781 12 " |

The proposition contained the following provision which has given rise to the present litigation: " * * * In case the reserves set up in the above balance sheet for liabilities of the Miniature Corporation prove to be too high, the unused portion will be distributed on or about January 20th, 1922 *pro rata.*"

The plaintiff accepted the offer, delivered her stock and received the equivalent of $188.77 a share.

Thereupon the supervision and control of the old stockholders and directors ceased, the operation being conducted by Mr. Harper with the same corporation, referred to for convenience as the old company to distinguish it from its operation under Mr. Harper as

sole owner, called the new company. Appellant's attorney wrote to Mr. Harper on January 3, 1921, requesting the latter to delegate a man to collect the notes and accounts receivable, to pay the liabilities, to keep separate bank and record books and to report monthly. When requested on February 6, 1922, for a settlement, he replied on March 1, 1922, that the balance in favor of the old stockholders was $2,858.11, which was being held in abeyance until the February, 1920, Federal tax report was audited. Later, on July 14, 1922, he wrote claiming the reserves were insufficient by $9,059.45.

In September, 1922, appellant brought this action under the aforesaid proposition for the purchase of her stock, made to her by respondent on February 1, 1922, and alleged to have been duly accepted by her, and under which she alleges that she sold and delivered her 150 shares of stock at the rate of $188.77 a share, for which she received the appropriate amount of General Electric common stock and debentures. In the complaint herein, appellant alleges:

"*Fifth.* That the reserves set up in said balance sheet were too high and the unused portion thereof subject to distribution was as follows:

| | |
|---|---:|
| Unused portion reserved for Federal taxes.......... | $2,309 79 |
| Unused portion reserved for allowances............. | 10,862 12 |
| Unused portion reserved for bad debts............. | 11,789 81 |
| Unused portion reserved for liquidation expense..... | 5,000 00 |
| Accrued liabilities................................ | 4,371 46 |
| " Total................................... | $34,333 18 |

" *Sixth.* That the said unused portion of said reserves amounted to Fifteen and 26/100ths ($15.26) Dollars a share and plaintiff's proportionate interest therein in respect of one hundred fifty (150) shares so sold by her amounted to Two thousand two hundred eighty-nine ($2,289) Dollars."

The complaint then sets forth that as the result of the foregoing appellant became entitled on or about January 20, 1922, to the sum of $2,289, payment of which has been demanded, but no part of which has been paid.

The answer denies the allegations of the 5th and 6th paragraphs of the complaint above quoted. It admits that appellant accepted respondent's offer and sold and delivered to it her 150 shares of stock and that the price therefor was paid to her.

Thus both parties stand upon the proposal of purchase of their

stock made to its stockholders by respondent, and accepted by them, and the only question involved is the construction of the clause therein contained as to reserves and the determination of what amount, if any, is payable to appellant as her proportionate share thereof under the agreement. Neither party asks for any modification or reformation of that agreement. From the judgment dismissing the complaint upon the merits, the present appeal is taken.

The first and most important question to be determined is whether appellant is entitled to the unused portion of each reserve; that is, shall each item of reserve as set forth in the offer to purchase appellant's stock be treated separately and independently so that appellant shall be held to have the right to participate in whatever surplus remains of any item or items, irrespective of whatever deficit may arise in the remaining items. The learned trial court refused to adopt appellant's contention that this was the proper method to follow, and on the contrary accepted respondent's contention that the reserves should be considered collectively, and that appellant was entitled to a further payment for the purchase of her stock, only if there was a surplus in the aggregate of all the reserves, after striking a balance between the surplus or deficit existing in the various separate items.

It is to be noted, as hereinbefore set forth, that the original tentative offer of purchase contained the provision: "*if any of the reserves* set up should be found to be high that, at that time, a further disbursement might be made."

In the offer ultimately made to the stockholders by defendant and accepted by them, this was changed to the following: "*In case the reserves* set up in the above balance sheet for liabilities of the Miniature Corporation prove to be too high, the unused portion will be distributed on or about January 20th, 1922, *pro rata.*"

Philip D. Wagoner, who represented the stockholders other than Harper, stated their intention to be: " Q. That offer was made on net worth, wasn't it? A. Yes. Q. And you distinctly figured out that it was made on a net worth basis? A. Yes. Q. And your intent was to make an offer on the net worth basis, wasn't it? A. Yes. Q. And your intention was carried out by that letter, wasn't it? A. Yes." This was admitted as well by Dr. A. J. Liebmann, one of the original stockholders, who owned 150 shares of the stock in respondent. Having in mind the significant difference in language between the tentative proposal and the actual offer to purchase, I am of the opinion that the interpretation to be placed upon the agreement to purchase, mutually agreeable to the parties and not now sought in any way to be changed, was that the learned trial

court was correct in construing that agreement as one providing for further compensation to the stockholders as part of the purchase price of their stock only in case there should prove to be a surplus in the *total amount* of the reserves over the actual expenditures. In other words, the appellant would be entitled to her *pro rata* share of any excess of the total reserves withheld for estimated expenditures over the total amount actually expended; and not to her *pro rata* share of any surplus in separate items, irrespective of any deficit in others. In this way only can the agreement be made effective providing for distribution of surplus of *the reserves,* and carrying out the basis of purchase which was actual *net worth.*

We are thus led to a consideration of the various items of the reserves as to which controversy has arisen. In the first place, the learned trial court found that consigned goods to the amount of $36,885.11 had been improperly included in the item of accounts receivable, and respondent should be given credit therefor as a proper charge against the reserves and deductible therefrom. Respondent concedes that in this finding there was an error of nearly $24,000, and that the proper amount of such consigned goods account was $12,967.81 only. But there is a fundamental objection to any disturbance of the amount fixed in the schedules as the reserve for accounts receivable ($146,784.37), and that is, that no issue was tendered by the pleadings as to any error in any item of assets upon which a reduction thereof could be based by the court. There was no claim of mistake, fraud or overreaching in the agreement of purchase ultimately made and upon which both parties stand. There was no prayer for relief by respondent by way of reformation of the agreement. The only thing left open thereunder for further adjustment was surplus in reserve for *liabilities.* Nothing was left open for future adjustment as to assets. The court, therefore, on the issues present was without power to readjust any item included in the balance sheet for assets, and respondent was not entitled to any reduction in the aggregate of assets for accounts receivable as set forth by it in the balance sheet ($146,784.37), either in the amount incorrectly found by the court as that of the consigned goods account ($36,885.11) or in the actual amount thereof ($12,967.81).

The next question presented is whether the learned trial court was correct in holding that there was a deficiency of $5,000.24 in the reserve for liquidation expense. The total amount reserved for that item in the agreement of purchase was $10,000. The items going to make up the total payment of $15,000.24 which are now challenged are, as follows:

| | | |
|---|---:|---:|
| Traveling expenses | $688 | 10 |
| Administrative expenses | 751 | 62 |
| Factory salaries | 1,774 | 89 |
| Officers' salaries | 1,612 | 64 |
| Special salary for Mr. Harper | 6,000 | 00 |
| Office salaries | 1,318 | 00 |
| Office supplies | 528 | 64 |
| General expenses | 39 | 01 |
| Legal expenses | 2,287 | 24 |
| | $15,000 | 24 |

I am of the opinion that there is to be found in the record herein sufficient evidence to justify the allowance of all these items except the following: Officers' salaries, $1,612.64; special salary for Mr. Harper, $6,000; administrative expenses, $751.62; entertainment expenses for " entertaining customers " after the date of the purchase of the stock, evidently for customers of the new regime in defendant, $421.12. The admissibility of the last item is destroyed by Harper's own testimony. As to the first two items, there is absolutely no evidence to show that they were a fair and reasonable amount to be paid by the old stockholders for the services rendered for their benefit by Harper who received these two amounts aggregating $7,612.64. He himself does not so testify. In the year 1922 he was receiving a salary from the reorganized company of $40,000, but he does not attempt to say what the fair and reasonable value was of the time and service which he devoted to the interests of the old stockholders in liquidating its affairs. The witness Brouner, in the employ of defendant and called as its witness, who made up the statement, and apportioned the charges, for the liquidation expenses to be charged against the old stockholders, testified as to how he made up the amount charged for office and factory salaries, apart from the amount paid to Harper, and as to that he testified: " In fixing Mr. Harper's compensation, I did it at his direction and for what he thought would be a fair compensation for himself and his efforts; " and again, " I would say that Mr. Harper's salary was set up by himself more than it was by me." Readjusted according to the failure of proof as to the items of $7,612.64, $421.12 and $751.62, above referred to, aggregating $8,785.38, which requires their elimination from the total of $15,000.24 for liquidation expenses, that item is reduced to $6,214.86, making a surplus in that item of the reserves of $3,785.14.

The third item is the reserve for Federal taxes, $92,544.36. The

amount actually paid out for such taxes by respondent was $82,775.33.

In September, 1924, two years after the commencement of this action, the Treasury Department submitted to the defendant its audit of the defendant's income tax returns and records for 1919 and 1920, and reported a deficiency in tax amounting to $17,581.79, divided into $694.62 for the year 1919 and $16,887.17 for 1920, at the same time rejecting the defendant's claim in abatement. The Treasury Department has apparently proceeded no further than to claim that the defendant was subject to an additional tax of $17,581.79; the additional tax was not assessed thereby and has not been paid by the defendant. While the court recognized that it is merely a claim against the defendant for the amount of proposed deficiency, it added the total of the reported deficiency, $17,581.79, to $82,775.33, which the defendant had actually paid, and ruled that the defendant's taxes equalled the total of the addition of those two items, or $100,357.12 in all. The court then declared that the difference between said $100,357.12 and $92,544.36, the amount reserved for Federal taxes, constitutes a net credit in favor of the defendant, and, therefore, a charge against the plaintiffs, in the sum of $7,812.76.

The mere assertion of a claim against respondent for the additional amount of taxes, accompanied by no assessment thereof, does not create a fixed and determined liability, calling for its inclusion as a sum properly chargeable against the former shareholders in determining the net balance of the reserves. Instead of charging them with a deficit of $7,812.76, they should be credited with a surplus of $9,769.03.

These considerations lead to the conclusion that instead of a net deficit in reserves as found by the learned trial court, there was a net surplus therein, made up of the following items:

| | | | | |
|---|---|---|---|---:|
| Surplus in reserve for Federal taxes........ | | | | $9,769 03 |
| " | " | " | allowances........... | 10,752 91 |
| " | " | " | bad debts........... | 11,789 81 |
| " | " | " | liquidation expenses.. | 3,785 14 |
| | | | | $36,096 89 |

Of this, the appellant as the original owner of 150 shares out of the total outstanding issue of 2,250, would be entitled, as her *pro rata* share of the excess, to the sum of $2,406.46; and the other appellants ratably in proportion to their holdings; and they are entitled to a reversal of the judgments appealed from, and to

judgment in their favor accordingly, with the costs of the trial and the costs and disbursements of the appeal.

Should respondent, however, desire to introduce further evidence as to the additional Federal taxes claimed, having since the trial been either paid or duly assessed against it; or as to the fair and reasonable value of the services performed by Harper, for which he was paid $7,612.64, and as to the necessity and propriety of the payments for administration expenses amounting to $751.62, in the interest of justice it may have a new trial as to those items only.

CLARKE, P. J., MERRELL, MCAVOY and WAGNER, JJ., concur.

In each case: Judgment reversed and judgment directed in accordance with opinion, with costs to appellant to abide the event. Should respondent, however, desire a new trial as to the additional Federal taxes claimed, or as to the value of services performed by Harper, and as to the necessity and propriety of the payments for administration expenses amounting to $751.62, a new trial may be had as to those items only.   Settle order on notice.